**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____ )
                                    )
LENA T. KONAH,                      )
                                    )
          Plaintiff,                )
                                    )
     v.                             )          Civil Action No. 10-904 (RMC)
                                    )
DISTRICT OF COLUMBIA, *et al.*,     )
                                    )
          Defendants.               )
_____ )

**OPINION**

Plaintiff Lena T. Konah, a United States citizen and native of Liberia, worked as a licensed practical nurse for Defendant Unity Health Care, Inc.  She was assigned to the medical unit at the Central Detention Facility operated by Defendant District of Columbia.  She complains that jail inmates made vulgar and lewd comments and gestures at the nurses constantly.  Ms. Konah further complains that, on August 5, 2009, she was trapped behind bars with a group of sexually threatening inmates but Defendant Sergeant Robert Jefferson, a correctional officer, would not open the gate to allow her to escape.  Because of experiences in her home country, this event thoroughly traumatized Ms. Konah, and she has been unable to return to work at the jail.

Ms. Konah claims that Unity's acts and omissions constituted discrimination based on gender and national origin and that Unity constructively discharged her by terminating her in retaliation for her complaints about the August 5, 2009, incident.  She also complains that the District of Columbia violated her rights under the Fourth and Fifth Amendments to the United States Constitution by "seizing" her and by denying her due process and equal protection.  Further, Ms. Konah alleges that Sgt. Jefferson intentionally inflicted emotional distress on her

1

and aided in the assault and battery that occurred when one of the inmates grabbed her on the buttocks.  In response to Ms. Konah's Third Amended Complaint, Unity and Sgt. Jefferson have filed motions for summary judgment.  The District of Columbia moves for judgment on the pleadings.

## I.  FACTS

### A.  Unity Health Care and the D.C. Central Detention Facility

Ms. Konah worked for Unity as a Licensed Practical Nurse from November 2006 through September 2009.[1]  Unity is a non-profit health care provider that operates a network of clinics for medical and social services in the District.  Her duty location for that entire time was the Central Detention Facility (CDF, also referred to as the D.C. Jail) in Southeast Washington, D.C.  Under its contract with the District, Unity provides medical treatment to inmates at CDF, as well as at the Correctional Treatment Facility and halfway houses.  Sealed Statement of Undisputed Material Facts Supp. Unity Mot. Summ. J. [Dkt. 67-5] (Unity SUF) ¶ 5.

Each of the "open population" housing units at CDF is monitored by a sergeant, who sits in a glass-walled control module called a "bubble" and who supervises floor officers and inmates.  *Id.* ¶ 10.  Inmates who qualify for open population are released from the cells but must remain in the cell block.  From the bubble, the sergeant controls one gate ("bubble gate") that connects the cell block to a narrow hallway called the "sally port,"[2] and a front gate that connects the sally port to the main hallway of the jail.  *Id.* ¶ 11; *see also* Def. Unity Health Care, Inc.'s Mot. Summ. J. (Unity MSJ), Ex. 22 [Dkt. 67-6], Supp. Decl. Vali Zabiheian (Zabiheian

---

[1] The facts are taken from the Third Amended Complaint [Dkt. 64] unless otherwise indicated. The Court refers to the Third Amended Complaint as "Complaint" except as otherwise made clear from context.

[2] A sally port is a secured controlled entryway, with doors at either end, used to control access to and from a prison or fortification.

Supp. Decl.), Ex. A (Sally Port Photograph).  The front gate from the main hallway is at one end

of the sally port, and the bubble gate into the cell block is at the other end.  Sally Port

Photograph.  Having a bubble gate and the front gate open at the same time is not permitted

because inmates could run out into the hallway of the jail, which would be a security breach.

Unity SUF ¶¶ 13, 51; *see also* Unity MSJ, Ex. 5 [Dkt. 67-6], Dep. of Robert Lee Jefferson, Jr.

(Jefferson Dep.) at 94 ("[T]hat's a security matter, because if I have both of them [open], that

means the inmate can run out into the hallway of the jail.").  Inmates are not supposed to be in

the sally port without a correctional officer present.  Unity SUF ¶ 49; Jefferson Dep. at 72, 76

("They're not supposed to be in there unsupervised, no.  If there's inmates in the sally port, there

should be an officer with them. . . . [W]e make [the inmates] get out the sally port.").

> One of Unity's duties is to administer medications to inmates, which nurses have

typically done in the housing units.  Unity SUF ¶¶ 7, 41.  Correctional officers are required to

accompany nurses at all times when they administer medication to inmates.  *Id.* ¶¶ 7–9; Unity

MSJ, Ex. 2 [Dkt. 67-6], Deposition of Lena Konah (Konah Dep.), at 95 (Q. "And are you

supposed to be escorted by an officer?  A. Yes.").  If an officer is not immediately available, a

nurse can "just come back and wait for one."  Konah Dep. at 100.  Waiting for an officer was

Ms. Konah's typical practice.  *Id.*

> Insulting interactions between inmates and nurses were not uncommon at CDF.

Unity SUF ¶¶ 22–26.  Sometime in April 2009, a nurse—not Ms. Konah—reported that an

inmate had thrown urine and feces at her.  *Id.* ¶ 33.  On April 21, 2009, several nurses, including

Ms. Konah, sent a letter to Unity complaining about security practices at the jail.  *Id.* ¶ 34;

Compl. ¶¶ 26, 31; *see also* Unity MSJ, Ex. 18 [Dkt. 67-6], Letter dated April 21, 2009 (4/21/09

Letter) at 1.  The letter described several recent incidents involving feces and "unknown liquids"

as well as the general difficulties of working around the inmates while distributing medication.[3] Unity SUF ¶ 34; *see also* 4/21/09 Letter at 1.  The letter asked Unity to change policies regarding medication administration so that officers would "bring the inmates to the bubble or to the sick call room" in lieu of the nurses "passing medication from cell to cell."  4/21/09 Letter at 1.  The sick call rooms are located in the sally ports for nurses to use in dispensing medication.  Unity SUF ¶ 41.  The sick call rooms have Dutch doors that enable a nurse to remain inside the room with the bottom half of the door closed while administering medications through the open top half of the door.  *Id.*; *see also* Sally Port Photograph.  To access sick call rooms, nurses sign out keys and return them when they are done.  Unity SUF ¶ 42.  These procedures had been in place and available for some time.  Unity MSJ, Ex. 9 [Dkt. 67-6], Decl. Bianca Thompson (Thompson Decl.) ¶¶ 8–11.  Ms. Konah knew the procedures, as she signed out a key and used a sick call room in March 2009.  *Id.* ¶ 11; *see also* Unity SUF ¶ 43.

The day after the nurses' complaint letter, Vali Zabiheian, Unity's Health Services Administrator and the senior management representative for Unity at the D.C. Jail, implemented a "sick call room policy."  Unity SUF ¶ 35; *see* Unity MSJ, Ex. 20 [Dkt. 67-6], Decl. of Vali Zabiheian (Zabiheian Decl.) ¶¶ 1, 7–8 & Ex. A (4/22/09 Zabiheian Memo) at 1.  The policy stated:

> Effective May 1, medication administration and dispensing by the nursing and pharmacy staff will take place in the sick call rooms on the housing units.  The medical staff will no longer walk on the housing units to administer medicine in open population.

4/22/09 Zabiheian Memo at 1.  On April 30, 2009, during a training meeting, all nursing staff at the Jail, including Ms. Konah, were instructed to use the sick call rooms when dispensing

---

[3] The incidents referenced in the letter all involved nurses other than Ms. Konah.  4/21/09 Letter at 1.

medicine.  Unity SUF ¶ 40.  According to Unity business records, during a discussion of "Medication Dispensing in Units," all nurses were instructed to "begin using the sick call rooms when meds are administered on the open population housing units.  On the lock down units, meds will still be walked cell to cell with an officer present."  Zabiheian Decl., Ex. B (Nursing Staff Meeting Record) at Bates UNITY136.  Mr. Zabiheian's memo was posted at the Jail where Unity employees clock in, in the nursing station, and in the medication room; a copy was also sent to Warden Simon Wainwright.  Zabiheian Decl. ¶ 8.  The requirement that a corrections officer escort nurses at all times remained in place.  Unity SUF ¶¶ 7, 9.  Ms. Konah signed the attendance sheet for the April 30, 2009 training, and the meeting record reflects her attendance, Nursing Staff Meeting Record at Bates UNITY132–33; she admits the signature is hers but does not remember any meeting on a new policy, *see* Konah Dep. at 54–59.

### B.  The August 5, 2009 Incident

Ms. Konah was assigned to dispense medication to inmates on August 5, 2009, in a CDF housing unit known as Southwest-1 or SW1.  Unity SUF ¶ 44.  Sgt. Jefferson was on duty at the Southwest-1 bubble that day.  On this occasion, Ms. Konah varied from her usual practice of waiting for an officer and entered the sally port unescorted.  Konah Dep. at 100, 103.  She began to dispense medications to inmates in the sally port, close to the front gate.  Unity SUF ¶¶ 45–46.  While she was there, the bubble gate opened and closed a few times, presumably to admit and discharge inmates obtaining medications.  *See* Zabiheian Decl., Exs. D & E (SW1 Videos from Aug. 5, 2009).  However, a group of inmates from the housing unit, dressed only in their undergarments, approached Ms. Konah in the sally port, making especially lewd and sexually threatening comments.  She went to the bubble and asked Sgt. Jefferson to open the front gate to the corridor outside the unit so she could get away from the inmates, but he refused to respond or to open the gate, leaving her trapped in the sally port.  As Ms. Konah returned to

the front gate, the semi-clothed inmates surrounded her, calling her names and using sexually

explicit language; one inmate grabbed her on the buttocks.  Ms. Konah asked him something to

the effect of "why did you touch me?" and screamed for help from Sgt. Jefferson.  *See* Unity

MSJ, Ex. 24 [Dkt. 67-6], DCDC-1 Report Completed by Lena Konah (Konah DCDC-1 Report);

*id.*, Ex. 25 [Dkt. 67-6], DCDC-1 Report Completed by Dr. Benedict Kargbo (Kargbo DCDC-1

Report).  Dr. Benedict Kargbo, a treatment specialist at the Jail, entered the sally port from the

housing unit, saw what was happening, and told the inmate to back away from Ms. Konah, which

he did immediately.  Unity SUF ¶ 52.  Dr. Kargbo joined Ms. Konah's demands that the front

gate be opened.  Kargbo DCDC-1 Report at 1–2.  Sgt. Jefferson eventually opened the front gate.

With a corrections officer at the entrance, Ms. Konah and Dr. Kargbo left the sally port at the

front gate and entered the main hallway of the Jail.[4]

---

[4] In reports completed on August 5, 2009, Ms. Konah described this incident twice:

> On Wednesday, August 5, 2009, at approximately 2:00 pm, after
> the completion of distributing medication in housing unit SW-1, I
> was standing at the front gate to exit the unit.  I observed several
> Inmates in the sally port that was surrounding me and proceeded to
> the control bubble to ask the officer to open the front gate.  When I
> walked back to the front gate, I was grabbed on the buttocks
> inappropriately by Inmate James Jamal [sic] #318-144 who was
> positively identified by case manager Dr. Benedict Kargbo who
> was also standing in the sallyport at the time.  Inmate James was
> positively identified by his armband and wingcard.

Unity MSJ, Ex. 24 [Dkt. 67-6], Disciplinary Report by Lena T. Konah (Konah
Disciplinary Report) at Bates UNITY228–29.

> Approximatly [sic] 2 pm I was at the sally port on SW-1 passing
> medication to an inmate.  I saw about 9 inmates coming out from
> unit to the sally port.  At this time, I got scared and asked officer at
> the bubble to open the gate for me to get out.  But he refused to let
> me out.  The inmates surrounded me and one of them grabbed my
> buttocks.  I turned around and asked him why did you touch me?
> At this time I started screaming.  I went back to the officer in the
> bubble to asked [sic] to open the gate again.  He open the gate this

Ms. Konah was immediately taken to the infirmary.  Unity SUF ¶ 56.  She also met with Unity and CDF management, including the Warden.  *Id.* ¶ 57.  She declined to press criminal charges against the inmate, who had been placed on lockdown and charged with several Class II Serious Offenses.  *Id.* ¶¶ 55, 57.  Ms. Konah completed incident reports.  At an unspecified date after August 5, 2009, she complained about sexual harassment to the Human Resources Office at Unity.  She later told her supervisor she could not return to work at CDF, where there is a "plethora of sexual violence incidents towards females."  Compl. ¶ 38.

### C.  Aftermath of August 5, 2009 Incident

In the meantime, Ms. Konah took a planned vacation and, on August 26, 2009, told Unity that she was too terrified of the Jail to return to work there.  Unity SUF ¶¶ 62–63.  She asked for a transfer to the chronic care unit of CDF to avoid the open-population cell blocks, but the "nurse manager" could not put her there and told her to "go back to [her] assigned area" or, if she did not want to do so, to "go home" because she "should not come back."  Konah Dep. at 118.  Unity agreed to look for a position outside of CDF.  Unity SUF ¶ 66.  In September 2009, Unity asked Ms. Konah to consider other open positions identified on Unity's Career Opportunity website, and she agreed.  *Id.* ¶¶ 68–69.  However, Ms. Konah was hospitalized in September or October 2009.  She admits that Unity contacted her attorney about a job opening but says she could not respond because she was in the hospital.  Konah Dep. at 142–44.

---

time.  I left the unit.  Case manager Dr. Benedict L. Kargbo was
also at the gate trying to get out.  He saw what happen [sic].

Konah DCDC-1 Report at Bates UNITY225–26.

Unity learned that Ms. Konah was hospitalized on October 9, 2009.[5]  It contacted

Ms. Konah and asked her to complete a Family and Medical Leave Act (FMLA) Application for

Leave and a Certification of Health Care Provider for Employee's Serious Health Condition.

Unity SUF ¶ 74.  *See* 29 U.S.C. § 2601 *et seq.* (FMLA), *especially* § 2613 (governing

certification requirements).  Unity provided these forms to Ms. Konah's caretaker at the hospital,

directed to Ms. Konah, but Ms. Konah never returned either the FMLA Application or the

Certification.  Unity SUF ¶¶ 75–76; *see also* Unity MSJ, Exs. 36–38 [Dkt. 67-6],

Correspondence Among Unity and Laurel Hospital Regarding FMLA Documents.  Further,

Unity notified Ms. Konah in November 2009 that it was holding a position for her at one of its

community clinics, Hunt Place Health Center, for which she only had to complete an application

on Unity's website.  Unity SUF ¶ 77; *see also* Unity MSJ, Ex. 39 [Dkt. 67-6], Correspondence

Regarding Open Position, at Bates UNITY770 (including e-mail to Ms. Konah's counsel dated

November 16, 2009, regarding open position at Hunt Place).  Unity waited until the end of

December 2009, but Ms. Konah never responded, and it filled the position with someone else.

SUF ¶¶ 78, 80; *see also* Correspondence Regarding Open Position at Bates UNITY770

(explaining that Unity was "releasing the hold" as of December 23, 2009, because "over a month

ha[d] passed with no application" from Ms. Konah).

Ms. Konah filed a complaint with the D.C. Office of Human Rights on December

3, 2009.  *See* Unity MSJ, Ex. 42 [Dkt. 67-6], OCHR Complaint.  On January 20, 2010, Unity

again offered her a position at the Hunt Place Health Center, which she accepted.  Unity SUF

---

[5] Ms. Konah's physician, Dr. Lanning E. Moldauer, states that Ms. Konah's sense of
powerlessness, helplessness, and fear when surrounded by the Jail inmates was amplified by the
terror she witnessed in Liberia.  *See* Unity MSJ, Ex. A [Dkt. 67-6], Report of Dr. Lanning E.
Moldauer (Moldauer Report), at 3, 5.  At an unspecified time, she was diagnosed at Laurel
Regional Hospital with Post Traumatic Stress Syndrome.

¶¶ 81–82.  On January 21, 2010, Unity sent Ms. Konah a letter asking her to complete the FMLA

documents before her scheduled return to work on January 27, 2010.  Unity MSJ, Ex. 38 [Dkt.

67-6], Jan. 21, 2010, Letter from S. Michele Ottley to Lena Konah (noting that Ms. Konah's

absence had been "provisionally designated as Intermittent F[amily] M[edical] L[eave]").  On

January 27, 2010, Ms. Konah did not show up for work.  Unity SUF ¶ 84.  Unity informed her

that it considered her failure to complete FMLA documents and failure to show up to work a

voluntary resignation.  *Id.* ¶ 85.  Ms. Konah admits that Unity offered her a job at another Unity

Healthcare facility and that she accepted the job in January 2010 but "there was some little

discrepancy" she could not recall that prevented her from reporting for work.  Konah Dep. at

144-45.[6]

      In her deposition, Ms. Konah answered many important questions, especially

about events after August 5, 2009, with the statement that she could not recall or could not

explain.[7]  Such a response is insufficient to create a legitimate dispute of material fact.  *See*

*Alyeska Pipeline Serv. Co. v. EPA*, 856 F.2d 309, 314 (D.C. Cir. 1988) ("[A] motion for

summary judgment adequately underpinned is not defeated simply by a bare opinion or an

unaided claim that a factual controversy persists."); *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190,

---

[6] Confusing an offer with a full agreement and contradicting her own testimony, Ms. Konah's
Statement of Disputed Facts asserts that she "did not receive a January 21, 2010 job offer
relating to this letter [from Unity] since the position was not finalized since all the terms were
not accepted in January 2010."  *See* Pl. Statement Disputed Facts [Dkt. 75] (Pl. SDF) ¶ 31.

[7] The deficits in Ms. Konah's recollection ranged from the improbable, *e.g.*, Konah Dep. at 22
(her first job), to the important, *e.g. id.* at 102 (the events of August 5, 2009), to the bizarre, *e.g.
id.* at 242–43 (whether she returned from a trip to Liberia in March 2012, three months prior to
the deposition).  She also said she could not "explain" a disconcerting number of answers or
concepts, even on matters not essential to the case.  *E.g.*, *id.* at 37 ("Q: And what did working
with inmates mean to you?  A.  Like working with a patient.  Q.  Could—could you just explain
that for me?  A.  I really can't explain it.  I—I wouldn't be able to explain to you."); *id.* at 90
("Q: And what were your duties while working as an LPN at Unity?  A:  I can't really explain
them to you in detail now.").

195 (D.D.C. 2008) ("[C]onclusory allegations and unsubstantiated speculation do not create genuine issues of material fact," especially "the plaintiff's own self-serving, conclusory statements." (internal quotation marks and citations omitted)). The business records submitted by Unity stand unrebutted and are relied upon by the Court.

### D.  Procedural History

Ms. Konah filed a complaint in this Court on June 2, 2010, and the case was assigned to the Honorable Ricardo M. Urbina. She filed an Amended Complaint on July 6, 2010, Dkt. 8, which Unity answered, Dkt. 10, and which Sgt. Jefferson and the District jointly moved to dismiss, Dkt. 11. Although the parties partially briefed the motion to dismiss, Ms. Konah moved to amend her complaint, and the Court granted that motion. *See* Mem. Order dated March 30, 2011 [Dkt. 24]. Ms. Konah then filed a Second Amended Complaint, Dkt. 25; Unity again answered, Dkt. 26, and Sgt. Jefferson and the District jointly moved to dismiss, Dkt. 27.

The Court granted in part and denied in part the motion to dismiss. *See Konah v. District of Columbia*, 815 F. Supp. 2d 61 (D.D.C. 2011). Concluding that Ms. Konah had not "put forth any facts that might allow the Court to conclude that the District was an employer under [D.C. Circuit precedent]," the Court dismissed her Title VII and D.C. Human Rights Act (DCHRA) claims against the District. *Id.* at 70–71 (citing, *inter alia*, *Redd v. Summers*, 232 F.3d 933 (D.C. Cir. 2000)). It likewise dismissed the Title VII claim against Sgt. Jefferson in his individual capacity, *id.* at 71–72; the claim of discrimination based on national origin against Sgt. Jefferson, *id.* at 73; the *Monell*[8] claim against the District based on an alleged pattern of sexual harassment arising from inadequate training of correctional officers, *id.* at 74–76; and the

---

[8] *Monell v. N.Y.C. Dep't of Social Servs.*, 436 U.S. 658, 691–92 (1978).

constructive discharge claim against Sgt. Jefferson, *id.* at 79–80.  The Court denied the motion to dismiss with regard to the Fourth Amendment claim against Sgt. Jefferson, *id.* at 72; the claim of gender discrimination against Sgt. Jefferson, *id.* at 72–73; the due process claim against Sgt. Jefferson, *id.* at 73–74; the claim of assault and battery against Sgt. Jefferson, *id.* at 80; and the claim of intentional infliction of emotional distress against Sgt. Jefferson, *id.* at 80–81.  The Court also declined to rule that Sgt. Jefferson was entitled to qualified immunity on any of the constitutional claims at the motion to dismiss stage, concluding that Ms. Konah had sufficiently pled violations of clearly established constitutional rights.  *Id.* at 78.  Furthermore, the Court exercised its discretion to retain supplemental jurisdiction over Ms. Konah's state law claims.  *Id.* at 78–79.

Sgt. Jefferson and the District answered the Second Amended Complaint, and the parties engaged in discovery.  The case was reassigned to the Honorable Rosemary M. Collyer on April 20, 2012, and, following a May 9, 2012, status conference, Ms. Konah filed her Third Amended Complaint, Dkt. 64.  Unity filed its answer, Dkt. 65, as did Sgt. Jefferson and the District, Dkt. 66.  Shortly thereafter, discovery closed.  Unity moved for summary judgment, Dkt. 67, which Ms. Konah opposes, *see* Dkts. 70–73.  The District moved for judgment on the pleadings, Dkt. 68, which Ms. Konah also opposes, Dkt. 79.  Sgt. Jefferson filed a separate motion for summary judgment, Dkt. 76; Ms. Konah filed her opposition to that motion on September 13, 2012, Dkt. 84.

The complaint currently before the Court is the Third Amended Complaint, Dkt. 64, which, as discussed below, varies in certain respects from Ms. Konah's prior complaints. Ms. Konah now brings the following seven claims: Count I, discrimination based on sex against the District and Unity, ¶¶ 39–47; Count II, discrimination based on national origin against Unity,

¶¶ 48–51; Count III, reprisal, against Unity and the District, ¶¶ 52–53; Count IV, a *Monell* claim against the District based on violation of her Fourth Amendment right to be free of unreasonable seizure and her Fifth Amendment rights to substantive and procedural due process and equal protection, ¶¶ 54–62; Count V, assault and battery against Sgt. Jefferson, ¶¶ 63–63; Count VI, intentional infliction of emotional distress against Sgt. Jefferson, ¶¶ 66–68; and Count VII, constructive discharge against Unity, ¶¶ 69–70.  All three of the defendants' motions are fully briefed and ready for disposition.[9]

## II.  LEGAL STANDARD

### A.  Motions for Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  In addition, the

---

[9] Ms. Konah sought to file a supplemental affidavit to her opposition to Unity's motion for summary judgment; following a telephone conference with the parties, the Court denied the motion. *See* Minute Order dated Sept. 5, 2012.

nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

### B. Motion for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings will be granted if the movant shows, at the close of the pleadings, that no issue of material fact remains to be resolved, and that he or she is entitled to judgment as a matter of law. *See Terry v. Reno*, 101 F.3d 1412, 1423 (D.C. Cir. 1996); *Haynesworth v. Miller*, 820 F.2d 1245, 1249 n.11 (D.C. Cir. 1987); *Summers v. Howard Univ.*, 127 F. Supp. 2d 27, 29 (D.D.C. 2000).

The standard of review for a motion pursuant to Rule 12(c) is essentially the same as that for motions to dismiss pursuant to Rule 12(b)(6). *Robinson–Reeder v. Am. Council on Educ.*, 532 F. Supp. 2d 6, 12 (D.D.C. 2008), *aff'd*, 417 F. App'x 4 (D.C. Cir. 2011); *Robinson v. District of Columbia*, 403 F. Supp. 2d 39, 47 (D.D.C. 2005). The court may not rely on facts outside of the pleadings and must "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992) (citations omitted). "The court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record." *Robinson*, 403 F. Supp. 2d at 47 (*citing EEOC v. St. Francis Xavier Parochial Sch.*,

13

117 F.3d 621, 624 (D.C. Cir. 1997) & *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993)).

Although "detailed factual allegations" are not necessary to withstand a motion for judgment on the pleadings, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted); *see also Mpoy v. Fenty*, __ F. Supp. 2d __, Civ. No. 09-1140, 2012 WL 5383030, at *3 (D.D.C. Nov. 5, 2012) (applying *Twombly* and *Iqbal* to motion for judgment on the pleadings). The facts alleged "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

### III.  ANALYSIS

The Court addresses Sgt. Jefferson's Motion for Summary Judgment before turning to Unity's Motion for Summary Judgment and, finally, the District's Motion for Judgment on the Pleadings.

#### A.  Sergeant Jefferson's Motion for Summary Judgment

Robert Jefferson is a sergeant at the D.C. Department of Corrections.  Ms. Konah complains that he "aided in the assault and battery" of Ms. Konah by the SW1 inmates with conduct that was "intentional, reckless, and in deliberate disregard of a high degree of probability that emotional distress would result to [Ms. Konah]."  Compl. ¶¶ 63–68.  Sgt. Jefferson moves for summary judgment.

##### 1.  Relevant Facts

Ms. Konah entered the sally port at 1:51:43 p.m. and left at 2:06:30 p.m., as shown by video of the front gate to the sally port.  *See* SW1 Videos from Aug. 5, 2009.  The video footage shows that the front gate opened and closed on five occasions while Ms. Konah

was in the sally port, including at 2:06:30, when she exited.  *Id.*; *see also* Konah Dep. at 205 ("Q.

And in that video the gate from the main hall into the sally port opened numerous times, didn't

it?  A. It did.").[10]  At one of those times, the gate remained open for almost four minutes.  Video

footage also shows that Sgt. Jefferson opened and closed the bubble gate four times while Ms.

Konah was in the sally port, allowing inmates to come and go from the sally port to the cell

block despite the fact that Ms. Konah was without an escort.  Although Ms. Konah contests the

point, Sgt. Jefferson testified that he was the only officer in the bubble and could not open the

front gate until another officer was present because the inmates already in the sally port could

have moved out of confinement.  Sgt. Jefferson also contends that Ms. Konah administered

medication to numerous inmates without incident while she was in the sally port, as the video

shows.  Jefferson Dep. at 51–52.  Ms. Konah agrees that she has no reason to dispute the videos,

Konah Dep. at 201 ("Q. . . . do you have any reason to dispute the video contents? A. I don't

have any reason, no."),[11] and her accounts of whether she distributed medication are

inconsistent, *compare id.* at 102–04 ("I did not administer any medication."), *with* Konah

DCDC-1 at Bates UNITY225–26 ("I was at the sally port on SW1 passing medication to an

---

[10] Ms. Konah protests that the no video shows the incident in question, when the inmates surrounded her and one grabbed her.  *See*, *e.g.*, Konah Dep. at 202-203.  One camera, identified as Camera #1, was directed at the SW1 front gate from outside of the gate.  Zabiheian Decl. ¶ 18. A second, identified as Camera #24, was located at the far end of the SW1 cell block from the sally port, showing the entire cell block as well as, from some distance, the bubble and bubble gates.  *Id.*  Thus, the interior of the sally port was not in view or captured by the video, which is distinctly not at movie quality.  Since there is no doubt or dispute that a group of semi-clothed inmates surrounded Ms. Konah and an identified (and disciplined) inmate grabbed her on her buttocks, the absence of a video recording of the incident is not material to resolution of the pending motions.

[11] In light of Ms. Konah's concession that she has no reason to challenge the video footage, the Court disregards counsel's vague and confusing assertion that the videos are not accurate.  *See* Pl. Disputed Facts ¶ 35 ("There is no visual of Plaintiff in the Sallyport passing medications is not on the video [sic].").

inmate."), *and* Konah Disciplinary Report at Bates UNITY228–29 ("[A]fter the completion of distributing medication in housing unit SW-1, I was standing at the front gate to exit the unit.").

Her recollections of August 5, 2009, are otherwise inconsistent.  She first testified that she went to the bubble and had her back to the front gate so that she could not see it open or close.  Konah Dep. at 196 ("Q. [T]he door at the main gate, was that opening and closing? A.  I can't recall because I was backing—my back is turned to the main gate and I'm facing the bubble.  So there is no way I can actually figure as to whether the gate is opening or closing.").  She then testified that she did, in fact, look at the gates, but did not see the gates opening and closing.  *Id.* at 200 ("I kept looking back and forth to see whether the gate is open for me to go out and I did not see it open.").  Despite these statements, she later admitted that she "saw the gate opening closing several times." *Id.* at 203.  The video shows that Sgt. Jefferson opened the front gate multiple times; whether Ms. Konah saw the gate open is unclear.

Sgt. Jefferson argues that the Court can and should disregard those parts of Ms. Konah's testimony that are disputed by the evidence on the video recordings.  Mem. P. & A. Supp. Jefferson Mot. Summ. J. (Jefferson MSJ Mem.) [Dkt. 76] at 8–11 (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that where the nonmoving party's evidence at summary judgment is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of summary judgment") & *White v. United States*, 863 F. Supp. 2d 41, 49 (D.D.C. 2012) (granting defendant's motion for summary judgment where video evidence contradicted assertion that decedent "had both hands raised in a gesture of surrender")).  Sgt. Jefferson contends that the videos clearly reveal that Ms. Konah was not held against her will and that, more to the point, he did not aid the alleged assault and battery by the inmates or intentionally inflict emotional distress on Ms. Konah.

16

Ms. Konah responds that, at best, Sgt. Jefferson admitted that he told her that he could not let her out until another officer was with him.  Pl. Mem. P. & A. Opp. Jefferson MSJ (Pl. Jefferson Opp.) [Dkt. 84-1], at 6–7; *see also* Jefferson Dep. at 52–54 ("She was asking to get out the gate, I couldn't open the gate— . . . I told her I had to bring an officer—we had inmates in the sally port.  So, I informed her, let me get an officer so I can let her out.").  However, she insists that Sgt. Jefferson really said nothing to her but merely stood and stared, refusing to assist as she cried out for help.  She maintains that the full facts, including the involvement of Dr. Kargbo, demonstrate that she was held against her will and that Sgt. Jefferson failed to free her.[12]

### 2. Constitutional Claims Against Sergeant Jefferson

In briefing the instant motion for summary judgment, both Sgt. Jefferson and Ms. Konah contest whether he violated her constitutional rights.  The Third Amended Complaint does not make any such claim against Sgt. Jefferson.  *Compare* Complaint [Dkt. 1] ¶¶ 31–33 (alleging Sgt. Jefferson acted with reckless disregard of Fourth Amendment rights), *and* Am. Compl. [Dkt. 8] ¶¶ 33–35 (same), *and* Second Am. Compl. [Dkt. 25] ¶¶ 41–45 (same for Fourth and Fifth Amendment rights), *with* Third Am. Compl. [Dkt. 64] ¶¶ 54–62 (alleging only that Sgt. Jefferson and others acted under color of state law (¶ 55) and that the District violated constitutional rights).  While the parties' arguments repeat earlier briefing, the Third Amended Complaint, modified by counsel for the fourth time, has dropped them.  What is now pled against Sgt. Jefferson are only the common law torts of assault/battery and intentional infliction of emotional distress.  Third Am. Compl. ¶¶ 62–68.

---

[12] The testimony of Dr. Kargbo on this crucial point favors the District and Sgt. Jefferson.  *See* Unity MSJ Ex. 15 [Dkt. 67-6], Dep. of Dr. Benedict Kargbo (Kargbo Dep.), at 18–22 (testifying that, after Ms. Konah asked to be let out, Dr. Kargbo knocked on the bubble asking to be let out, but "the front door was not open at all with the inmates that much in the sally port"; Sgt. Jefferson eventually opened the front gate).

The Court will address the common law claims presented in the Third Amended Complaint before it. For clarity's sake, however, in case the issue is raised on appeal, the Court notes that if there were remaining constitutional claims against Sgt. Jefferson, it would find that he is entitled to qualified immunity. Qualified immunity is "a defense that shields officials from suit if their conduct 'd[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Ortiz v. Jordan*, 131 S. Ct. 884, 888 (2011) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Courts employ a two-step inquiry to determine whether qualified immunity applies, looking (1) at whether a constitutional right was violated and (2) whether that right was clearly established. *See Saucier v. Katz*, 533 U.S. 194, 201 (1999); *Johnson v. District of Columbia*, 528 F.3d 969, 973 (D.C. Cir. 2008). These two steps may be analyzed in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Ms. Konah entered the sally port at 1:51:43 p.m. and left at 2:06:30 p.m. The video shows that Sgt. Jefferson opened the front gate multiple times while Ms. Konah was in the sally port. She does not challenge the video. Her constitutional claims—whether interpreted as false imprisonment, unreasonable seizure, lack of due process, or equal protection—all reduce to the argument that Sgt. Jefferson should have sounded an emergency call or "code" to bring other guards running and extricate her sooner. *E.g.*, Pl. Jefferson Opp. at 11 ("[Sgt. Jefferson] neither sounded an alarm [n]or placed a call on his radio to other officers standing outside the gate, he stood and just look at Plaintiff [sic] . . . ."). Ms. Konah fails completely to demonstrate that a reasonable corrections officer in Sgt. Jefferson's position would or should have known that failure to open the front gate more frequently or to sound an alarm would have violated her

constitutional rights.  *See Ortiz*, 131 S. Ct. at 888.  He is entitled to qualified immunity and cannot be sued.[13]

### 3. Common Law Claims Against Sgt. Jefferson

Ms. Konah brings claims under District of Columbia law against Sgt. Jefferson: Count V, assault and battery—two distinct causes of action, *see Jackson v. District of Columbia*, 412 A.2d 948, 955 (D.C.1980)—and Count VI, intentional infliction of emotional distress.  Judge Urbina, in his opinion denying in part the District and Sgt. Jefferson's motion to dismiss, exercised supplemental jurisdiction over the state law claims because those claims and Ms. Konah's federal claims arose from a "common nucleus of operative fact."  *Konah*, 815 F. Supp. 2d at 78–79 (citing 28 U.S.C. § 1367(a)).  The Court will retain supplemental jurisdiction at this juncture, given the clarity of the applicable law and the developed nature of the record.

District of Columbia law on these three common law torts is clear, and it is clear in a way fatal to Ms. Konah's claims: all three torts require proof of intent on the part of Sgt. Jefferson.  "An assault is an *intentional and unlawful* attempt or threat, either by words or acts, to do physical harm to the plaintiff."  *Smith v. District of Columbia*, 882 A.2d 778, 787 (D.C. 2005) (internal quotation marks and citations omitted; emphasis added).  "A battery is an *intentional* act that causes a harmful or offensive bodily contact."  *Id.* (internal quotation marks and citations omitted; emphasis added).  Intentional infliction of emotional distress requires "extreme and outrageous conduct on the part of the defendant which *intentionally or recklessly* causes the

---

[13] Judge Urbina, to whom this case was originally assigned, denied Sgt. Jefferson's pre-discovery motion to dismiss based on qualified immunity.  815 F. Supp. 2d at 78.  That decision does not control the result at summary judgment.  *See Olaniyi v. District of Columbia*, 763 F. Supp. 2d 70, 100 n.24 (D.D.C. 2011) ("'[T]he legally relevant factors bearing upon the [qualified immunity] question will be different on summary judgment than on an earlier motion to dismiss,' because on 'summary judgment . . . the plaintiff can no longer rest on the pleadings.'" (quoting *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996))).

plaintiff severe emotional distress." *Kotsch v. District of Columbia*, 924 A.2d 1040, 1045 (D.C. 2007) (internal quotations and numbering of elements omitted; emphasis added).  Ms. Konah simply has not adduced any credible evidence tending to show that Sgt. Jefferson delayed opening the gate intending that Ms. Konah suffer an assault, a battery, or emotional distress.  Her best argument on this point is that "Defendant Jefferson caused the offensive contact on Plaintiff because he refused to open the back gate for her to exit, ultimately causing unwanted contact at the hands of the inmates."  Pl. Jefferson Opp. at 23.  Likewise, her best evidence on the point is her own deposition testimony:

> Q: So other than . . . not opening the gate upon your request before the inmate touched you, what did the District of Columbia or—and/or Robert Jefferson do that caused you the injury that you are claiming?
>
> A: He did not open the gate to let me out as I asked him before the inmate came and touched me.
>
> Q: What else—what else did the District of Columbia or Robert Jefferson do other than not opening the gate?
>
> A: He just did not open the gate.  That's all he did.  He stood there, look at me.

Konah Dep. at 227–28.

The trouble is that there is nothing in the record—even in Ms. Konah's sometimes self-serving deposition testimony—suggesting that Sgt. Jefferson delayed opening the gate with the intention that Ms. Konah suffer an assault, a battery, or emotional distress.  *See* Restatement (Second) of Torts § 18, cmt. e ("It is not enough to make the act intentional that the actor realize that it involves any degree of probability of a harmful or offensive contact or an apprehension of such contact, less than a substantial certainty that it will so result.").  That deficit might not be fatal to Ms. Konah's claims if the case were in a different posture; "subjective intent can rarely be proven directly" and often "must be inferred."  *See Waldon v. Covington*, 415 A.2d 1070,

1077 (D.C. 1980). However, the record is not bare, and the pending motion is for summary

judgment, not to dismiss. The time for Ms. Konah to provide circumstantial evidence of intent is

now. Even her deposition, viewed in the light most favorable to her and setting aside the many

inconsistencies and memory gaps, does not tend to show that Sgt. Jefferson "just did not open the

gate" for any reason other than that there were inmates in the sally port who would have been

able to escape confinement. The record also includes Sgt. Jefferson's deposition, Dr. Kargbo's

deposition, the video recordings, and a plethora of documentary evidence, all demonstrating that

Sgt. Jefferson delayed opening the front gate for Ms. Konah due to security reasons, not because

he wished to see harm befall her. *See* Jefferson Dep. at 93–101 ("I was waiting for an officer to

come, because I had inmates inside the sally port."); Kargbo Dep. at 18. On the basis of this

evidence, there is no genuine dispute of material fact, because the evidence does not suggest that

Sgt. Jefferson acted intentionally, that he acted recklessly, or that his actions were otherwise "so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency."[14] *Paul v. Howard Univ.*, 754 A.2d 297, 308 (D.C. 2000) (quoting *Jackson*, 412 A.2d

at 957)); *see also* Restatement (Second) of Torts § 32(1) ("The actor must have intended to

inflict a harmful or offensive contact upon the other or to have put the other in apprehension of

such contact.").

---

[14] The parties have not argued that the Court should apply a privilege analysis to the tort claims, but Sgt. Jefferson is likely entitled to a privilege defense insofar as he waited to open the gate for security reasons. *See* Restatement (Second) of Torts § 10(2)(b) ("A privilege may be based on the fact that its exercise is necessary for the protection of some interest of the actor or of the public which is of such importance as to justify the harm caused or threatened by its exercise . . . .").

The Court will, therefore, grant summary judgment in favor of Sgt. Jefferson on Ms. Konah's claims of assault, battery, and intentional infliction of emotional distress.[15]

### B. Unity's Motion for Summary Judgment

Pending against Unity are Ms. Konah's claims of discrimination based on sex, Count I; discrimination based on national origin, Count II; reprisal (retaliation), Count III; and constructive discharge, Count VII. There are no genuine disputes of material fact, and summary judgment will be granted in favor of Unity.

### 1. Discrimination Based on Sex and National Origin

In the Third Amended Complaint, Ms. Konah seeks to hold Unity liable for discrimination based on sex and national origin under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq*.[16] She has, however, abandoned her claim that she was subject to disparate treatment on the basis of her Liberian national origin. *See* Pl. Opp. & Mem. L. Def. Unity MSJ (Pl. Unity Opp.) [Dkt. 71] at 24 (conceding she has not put forth sufficient evidence to support Count II). Accordingly, summary judgment will be granted in Unity's favor on that claim.

The Court turns to Ms. Konah's sex discrimination claim against Unity, which is based on the theory that Unity "created an abusive work environment" and "failed to remedy sexually offensive conduct by inmates/staff, gender specific abusive language and sexual assault [that] was ongoing and [] continuous." Compl. ¶¶ 42–43.

---

[15] As discussed above, Judge Urbina's denial of the motion to dismiss on these counts does not require a ruling in Ms. Konah's favor on summary judgment.

[16] Title VII and the DCHRA are interpreted coextensively. *E.g.*, *Elhusseini v. Compass Grp. USA, Inc.*, 578 F. Supp. 2d 6, 18 (D.D.C. 2008).

"To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008).  To prevail on a hostile work environment claim, a plaintiff must show that her employer subjected her to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).  The conduct must be sufficiently extreme to constitute an alteration in the conditions of employment, so that Title VII does not evolve into a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.*

Employers can be liable for a hostile work environment created through the actions of third parties, such as inmates. *Beckford v. Dep't of Corr.*, 605 F.3d 951, 957–58 (11th Cir. 2010).  In such cases, the employer may be liable if he "fails to take immediate and appropriate corrective action in response to a hostile work environment of which the employer knew or reasonably should have known." *Id.* (discussing "uniform[]" approach of circuit courts to this issue).[17]

---

[17] The D.C. Circuit has not formally adopted this standard for third-party hostile work environment claims, although it did so implicitly in an unpublished opinion involving a professor's claim that her employer failed to take sufficient action to protect her from sexual harassment by a homeless man.  *See Martin v. Howard Univ.*, 275 F. App'x 2, 5–6 (D.C. Cir. 2008).  Given the agreement among the circuit courts and the D.C. Circuit's use of the same "negligence" standard for co-worker harassment claims, *see Curry v. District of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999), the Court employs the *Beckford* analysis here.

As a threshold matter, the Court notes that its analysis of the sex discrimination claim focuses primarily, though not exclusively, on the August 5, 2009 incident involving Ms. Konah.  She has alleged that the "sexually offensive conduct by inmates/staff, gender specific abusive language and sexual assault" was "ongoing and a continuous practice."  Compl. ¶ 42. But she has put forth only meager, unpersuasive evidence that such incidents were anything other than isolated incidents of the regrettable yet inevitable kind that should be expected to occur in jails.  *See Powell v. Morris*, 37 F. Supp. 2d 1011, 1017 (S.D. Ohio 1999) ("[A]nyone who works at a prison, particularly in a position with frequent inmate contact, must expect some off-color interactions. . . . It is absurd to expect that a prison can actually stop all obscene comments and conduct from its inmates.").  The April 21, 2009 letter of complaint from the group of ten nurses is in the record, and Sgt. Jefferson and Dr. Kargbo both testified that they were aware of inmates using foul language, throwing fecal matter or urine, or masturbating in front of correctional employees.  Jefferson Dep. at 41–49, 91–92; Kargbo Dep. 68–69.  But both stated that these behaviors were directed at male and female workers, guards and nurses alike.

Ms. Konah testified only that she "was not the only nurse that [sexually harassing insults had] been said to," and when pressed for details or names, she said: "I won't be able to pinpoint because I can't recall.  So I can just tell you that there were other incidents where inmates have told nurses these things."  Konah Dep. at 233–35.  She has not identified any other incidents in which inmate misconduct was directed at her other than vaguely attempting to adopt the events in the April 21, 2009 letter as having happened to her.  *Id.* at 68–69.  She claims she reported prior incidents she experienced to Unity but has not provided any evidentiary support for those assertions, *id.*; the absence of any such evidence is notable in a case in which Unity's business records are extensive.  Courts in this Circuit "frown[ ] on plaintiffs who attempt to

24

bootstrap their alleged discrete acts of [discrimination or] retaliation into a broader hostile work environment claim." *Baloch v. Norton*, 517 F. Supp. 2d 345, 364 (D.D.C. 2007), *aff'd*, 550 F.3d 1191. Accordingly, the Court relies on the testimony of Sgt. Jefferson and Dr. Kargbo and the nurses' complaint letter for context but focuses on the August 5, 2009 incident involving Ms. Konah in evaluating her hostile work environment claim.

Unity argues that it worked with the D.C. Department of Corrections (DOC) to ensure that there were "reasonable policies in place to prevent inmates from assaulting nurses." Unity MSJ at 11. Noting that DOC, not Unity, is "responsible for all safety and security procedures at CDF," Unity emphasizes that it implemented a policy requiring nurses to administer inmate medications in the sick call rooms, effective May 1, 2009, and that Ms. Konah, who had been trained on this policy, violated it on August 5, 2009. *Id.* Unity also argues that Ms. Konah's allegations do not support a hostile work environment claim because the August 5, 2009 incident was isolated and not "extremely serious" as case law requires. *Id.* at 15–16 (citing, *inter alia*, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)).

Ms. Konah's primary argument derives from what she perceives as Unity's "'negligence and ratification' of the harassment through its failure to take appropriate and reasonable responsive action" to "Plaintiff's and other nurses['] complaints of an abusive environment." Pl. Unity Opp. at 12 (citing *Freitag v. Ayers*, 468 F.3d 528, 538 (9th Cir. 2006)). Characterizing Unity's efforts to protect its nurses as "minuscule," "ineffective and not prompt," Ms. Konah devotes the bulk of her opposition brief to arguing that disputes of fact regarding the medication distribution policy and practice preclude summary judgment. *Id.* at 12–24.

The Court concludes that Unity took reasonable and appropriate corrective steps to ensure that the environment for Unity nurses at CDF would be as safe and non-hostile as a job

situation in a jail requiring direct contact with inmates could be.  As a contractor with DC DOC, Unity was ultimately bound by DOC's security policies.  Unity SUF ¶ 6.  Unity also worked with DOC to develop its own policies applicable to Unity employees to ensure their safety, such as requiring Unity nurses to be escorted at all times by an officer.  The record demonstrates that Unity was responsive to security concerns raised by its nurses, reacting to the April 2009 complaint letter by instituting the sick call room policy: "Effective May 1, medication administration and dispensing by the nursing and pharmacy staff will take place in the sick call rooms on the housing units." 4/22/09 Zabiheian Memo at 1.  The follow-up by Unity and DOC to the August 5, 2009 incident was also comprehensive, including the immediate medical evaluation of Ms. Konah by the infirmary, a meeting with the warden, the offer of criminal prosecution, and the use of the internal CDF disciplinary system to which inmates are subject.

       The mere existence of security measures might be disregarded if Ms. Konah were unaware of them, but there is no genuine dispute of material fact that she knew of the escort policy and the sick call room policy.  Unity SUF ¶ 11 (Ms. Konah used a sick call room in March 2009), Konah Dep. at 95, 100 (Ms. Konah was aware of the escort policy and typically followed it), Nursing Staff Meeting Record at Bates UNITY132–33 (Ms. Konah signed attendance sheet for training on sick call room policy).  Ms. Konah was, apparently, in violation of Unity policies when the August 5, 2009 incident took place.  Indeed, Ms. Konah says she normally waited for a guard to escort her and offers no explanation for why, on August 5, she departed from this practice.  Her brief speculates that Unity "could have gone outside of DOC and brought the matter to the attention of higher level officials" or "properly monitored [and] developed a clear policy on dispensing medication and provided safety equipment for the nurses," Pl. Unity Opp. at 23–24, but Ms. Konah herself concedes that "Unity was not on the unit

with me.  It was the officer that was on the unit with me.  So I'm—the officer was the one that should have done something to prevent the incident happening to me," Konah Dep. at 113. Unity took reasonable measures to prevent harassment and is not liable.  *See Beckford*, 605 F.3d at 959–60 (listing as reasonable measures, *inter alia*, accompaniment of female staff by security; requiring officers to write disciplinary reports; permitting female staff to report misconduct by inmates; and permitting nurses "to use screens at cell windows and in the bubble to prevent harassment").

### 2. Retaliation

The Court turns next to Ms. Konah's vague retaliation claim, which includes only the conclusory statement that "she was subsequently subjected to an adverse action because she opposed discriminatory treatment."  Compl. ¶ 52.  Her opposition brief states the legal standard for a retaliation claim and then recites, without further legal argument, Ms. Konah's version of the events that took place after August 5, 2009, from Ms. Konah's vacation to her eventual termination by Unity.  Pl. Unity Opp. at 24–25.

Title VII's antiretaliation provision prohibits an employer from "discriminat[ing] against" an employee because she has "opposed" a practice proscribed by Title VII or because "[s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing."  42 U.S.C. § 2000e–3(a).  To make out a retaliation claim, a plaintiff must show "(1) that [s]he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against [her]; and (3) that the employer took the action 'because' the employee opposed the practice."  *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012). Materially adverse actions are not limited "to those that are related to employment or occur at the workplace."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).  However, a

plaintiff must show that the employer's actions "would have been materially adverse to a reasonable employee." *Id.* at 68. Further, "an employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 56.

When the employer offers a "legitimate, non-discriminatory reason" for the allegedly materially adverse action, "the sole remaining question" becomes "retaliation *vel non*—whether, based on all the evidence, a reasonable jury could conclude that [the] proffered reason . . . was pretext for retaliation." *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 603–04 (D.C. Cir. 2010) (internal quotation marks and citations omitted); *see also McGrath*, 666 F.3d at 113 n.3 ("[T]he only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation." (internal quotation marks and citations omitted)). A plaintiff can show pretext "either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)).

The Court need not be detained by the imprecise nature of Ms. Konah's allegations because the record is devoid of any evidence to sustain a retaliation claim, either on the theory that Unity retaliated against Ms. Konah for reporting the August 5, 2009 incident by offering her a transfer to a community health center or by terminating her in January 2010. There is no genuine dispute of material fact that Unity had legitimate, nondiscriminatory reasons in offering a transfer from a job setting in which Ms. Konah believed she could no longer work—CDF—to one that would be more amenable. Unity has never questioned Ms. Konah's inability to work among inmates after August 2009. To the contrary, the record reveals that it

made multiple efforts to preserve her job and accommodate her during and after her hospitalization, providing prompt and informative communications to Ms. Konah's caregiver. *See generally* Correspondence Among Unity and Laurel Hospital Regarding FMLA Documents; Correspondence Regarding Open Position.

Furthermore, contrary to Ms. Konah's argument that "she was terminated, without even knowing that she had a viable job offer," Pl. Unity Opp. at 25, Ms. Konah acknowledged that she "accepted the position" and "agree[d] to go back to work," Konah Dep. at 145.  Thus, when Unity terminated Ms. Konah for failing to return to work, it acted with a legitimate reason that the documentary evidence overwhelmingly shows was not a pretext for retaliation. *See* Unity MSJ, Ex. 45 [Dkt. 67-6], Letter From Sidney Jackson dated Jan. 27, 2010, at 1 ("You failed to report to Michele Ottley . . . as directed in the correspondence sent to you on January 21, 2010 via courier.  You further failed to contact Ms. Ottley or anyone else in Human Resources in response to the correspondence.").  Accordingly, summary judgment will be granted to Unity on Ms. Konah's retaliation claim.

### 3. Constructive Discharge

Ms. Konah's final claim against Unity is Count VII, constructive discharge.  She asserts that Unity was "aware of the abusive environment," which "caused harm to [Ms. Konah] to the extent that the environment was no longer tolerable and as a result [Ms. Konah] was constructively discharged and/or terminated."  Compl. ¶ 70.  This claim also fails.

A constructive discharge claim "'depends on whether the employer deliberately made working conditions intolerable and drove the employee out." *Mungin v. Katten Muchin & Zavis,* 116 F.3d 1549, 1558 (D.C. Cir. 1997) (citing *Clark v. Marsh,* 665 F.2d 1168, 1173 (D.C. Cir. 1981)); *see also Pa. State Police v. Suders,* 542 U.S. 129, 147 (2004) ("A plaintiff who

advances such a compound [hostile work environment/constructive discharge] claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign."). A finding of intentional discrimination is a necessary predicate for a finding of constructive discharge. *Bishopp v. District of Columbia,* 788 F.2d 781, 790 (D.C. Cir. 1986). As set forth above, the record does not demonstrate intentional discrimination by Unity against Ms. Konah. Unity took reasonable measures to ensure the safety of its employees in CDF, an inherently difficult working environment in the best of circumstances, and then attempted to accommodate Ms. Konah's inability to work in CDF through a transfer to a position in a community health center. This is not the "extreme mistreatment" required to sustain a constructive discharge claim. *See Robinson-Reeder*, 532 F. Supp. 2d at 18. The Court thus grants Unity's motion for summary judgment on the constructive discharge claim.

### 4. Conclusion

As discussed above, there are no genuine disputes of material fact regarding any of Ms. Konah's claims against Unity, which is entitled to judgment as a matter of law. The Court thus grants Unity's motion for summary judgment in its entirety.

### C. The District of Columbia's Motion for Judgment on the Pleadings

The Complaint advances three counts against the District: Count I, discrimination based on sex; Count III, retaliation for Ms. Konah's opposition to sex discrimination; and Count IV, violations of her Fourth and Fifth Amendment rights due to inadequate training of correctional officers, leading to a custom or practice of sexual misconduct to which the District was deliberately indifferent. The District moves for judgment on the pleadings on all three counts; the Court grants the motion except as to Ms. Konah's equal protection claim.

### 1.  Sex Discrimination and Retaliation Claims

Addressing the Second Amended Complaint, the Court earlier dismissed allegations that the District violated Title VII and the DCHRA because Unity was Ms. Konah's employer, not the District.  *See* 815 F. Supp. 2d at 70–71 (citing, *inter alia*, *Redd v. Summers*, 232 F.3d 933 (D.C. Cir. 2000)).  Those counts were dismissed without prejudice because the Second Amended Complaint neither alleged that Ms. Konah was a District employee nor put forth facts that might allow a court to find that the District was a joint employer.  *Id.*  In the instant Complaint, as she did before, Ms. Konah acknowledges that she worked for Unity but again states that "[h]er employment status with the District of Columbia has to be determined."  Compl. ¶¶ 5, 6.  Ms. Konah has not corrected the flaws that led the Court to dismiss her Title VII and DCHRA claims against the District.  The same analysis applies now.  Her claims based on Title VII and the DCHRA as against the District—Count I, discrimination based on sex, and Count III, retaliation—will be dismissed, with prejudice, because the District was not her employer.[18]  Further, the Court notes that Ms. Konah's EEO charge complained only against Unity as her employer, not the District.[19]

---

[18] Although the District's motion is for judgment on the pleadings and Ms. Konah's Complaint is facially deficient as discussed in the text, the Court notes that Ms. Konah was subject to lengthy questioning on this point during her deposition.  The relevant portion of the transcript lasts eighteen pages, during which Ms. Konah repeatedly testifies that "[i]t was only Unity that I was employed for at the jail."  Konah Dep. at 160–61; *see also id.* at 162 ("Q. Were you employed by the District of Columbia on August 5, 2009?  A.  I was employed by Unity.").  *But see id.* at 163 ("I can't answer the question because I was in the District of Columbia facility, but I was employed by Unity.  That's what I'm saying.  So I'm not sure what the question is.").

[19] *See* OCHR Complaint, filed with the District of Columbia Office of Human Rights and cross-filed with the EEOC (identifying Unity as "Respondent #1" and "D.C. Department of Corrections (D.C. Jail)" as "Respondent #2").  Ms. Konah asserted: "I believe I have been discriminated against, subjected to sexual harassment, a hostile work environment and subjected to retaliation by Respondent on the bases of gender (female) and national origin (Liberia) because: I was hired by Respondent as Licensed Practical Nurse on or about November 6, 2006 and I performed my duties satisfactorily. . . . During my tenure with Respondent #1, I have been

## 2. Alleged Constitutional Violations

Ms. Konah's constitutional claims against the District stem in the first instance from the same allegation underlying her claims against Sgt. Jefferson: that when she asked him to open the cell doors, he did not do so immediately.  Ms. Konah alleges violations of her Fourth Amendment right to be free from unreasonable seizure and her Fifth Amendment right to due process before incarceration.  Ms. Konah clarifies in her opposition to the District's motion that "by not calling CODE Blue or using [some] other means of communication or alarms, limitations were imposed so that other[] [officers] who could have come to Plaintiff['s] rescue" were not summoned.  Pl. Opp. Mot. J. Pleadings [Dkt. 69] (Pl. D.C. Opp.) at 20.  Additionally, Ms. Konah alleges that she was a victim of sexual harassment in violation of the Equal Protection Clause and that this claim is actionable under 42 U.S.C. § 1983.  She cites *Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir. 1996)*; Pontarelli v. Stone*, 930 F.2d 104, 113–114 (1st Cir. 1991), *abrogated on other grounds by Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993); *Starrett v. Wasley*, 876 F.2d 808, 814 (10th Cir. 1989); and *Poulsen v. City of North Tonawanda, N.Y.*, 811 F. Supp. 884, 894 (W.D.N.Y. 1993), to support her constitutional claim to equal protection.  Pl. D.C. Opp. at 13.

Constitutional claims against municipalities like the ones advanced by Ms. Konah require a two-step analysis.  *See Baker v. District of Columbia*, 326 F.3d 1202, 1306 (D.C. Cir. 2003) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)).  "First, the court must determine whether the complaint states a claim for a predicate constitutional violation."  *Id.* (citation omitted).  However, the mere allegation of a constitutional violation is not enough.  The

---

subjected to derogatory comments and other sexually harassing acts by inmates of the Respondent #2.  My employer (Respondent #1) has done nothing to eliminate this harassment . . . ."  *Id.*

Court must also inquire "whether the complaint states a claim that a custom or policy of the municipality caused the violation." *Id.* (citing *Collins*, 503 U.S. at 120; *Monell*, 436 U.S. at 694).

Ms. Konah's two lines of argument—on the one hand, Fourth Amendment and Fifth Amendment claims, and, on the other, an Equal Protection claim—must be addressed separately. As to the first, Ms. Konah's alleged constitutional right was either to have the front gate opened more immediately or to have Sgt. Jefferson call a "Code" to summon help more immediately. As alleged in the Complaint, and even as expanded in her brief, Ms. Konah fails to articulate a constitutional violation for which the District might be liable. The actor against whom these allegations run is Sgt. Jefferson. As set forth above, Ms. Konah has not pursued those claims as against Sgt. Jefferson in the Third Amended Complaint; even if she had, the Court would find that he is protected by qualified immunity. Ms. Konah makes no express claim—and none is revealed by the multiple complaints or briefs or the evidentiary record—that any other person or entity had control over the gates to Southwest One on August 5, 2009. But a municipality cannot be held liable under § 1983 under a theory of respondeat superior, solely because it employed a tortfeasor. *Monell*, 436 U.S. at 691–92. It can only be liable "where the municipality itself causes the constitutional violation at issue." *Simms v. District of Columbia*, 587 F. Supp. 2d 269, 276 (D.D.C. 2008) (citing *Monell*, 436 U.S. at 694).

Ms. Konah makes no claim that Sgt. Jefferson failed to open the gates to the sally port more immediately because of any action or inaction by the District, much less that any "custom or policy" of the District caused the violation. *See id.* Moreover, as discussed above, Ms. Konah's testimony reveals that she entered the sally port voluntarily, without waiting for an officer to escort her, and Sgt. Jefferson was unable to open the gate until an officer secured the

inmates so that the interior gate could be shut.  The incidental delay Ms. Konah suffered was not

an unreasonable seizure in violation of the Fourth Amendment or a violation of due process in

contravention of the Fifth Amendment.  *See Butera v. District of Columbia*, 235 F.3d 637, 651

(D.C. Cir. 2001) ("To assert a substantive due process violation, however, the plaintiff must also

show that the District of Columbia's conduct was 'so egregious, so outrageous, that it may fairly

be said to shock the contemporary conscience.'" (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S.

833, 847 n.8 (1998))).

      Analysis of Ms. Konah's claim of sexual harassment proceeds differently.  The

Court first evaluates whether Ms. Konah has alleged a constitutional violation.  "[T]he Due

Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection

of the laws." *Davis v. Passman*, 442 U.S. 228, 234 (1979) (citations omitted).[20]  "To withstand

scrutiny under the equal protection component of the Fifth Amendment's Due Process Clause,"

gender classifications must meet so-called "intermediate scrutiny," meaning that they "must

serve important governmental objectives and must be substantially related to achievement of

those objectives." *Id.* at 235; *see also United States v. Virginia*, 518 U.S. 515, 533 (1996)

(applying same test to Fourteenth Amendment equal protection claim of gender discrimination).

"The equal protection component of the Due Process Clause thus confers . . . a federal

constitutional right to be free from gender discrimination which cannot meet these

requirements." *Passman*, 442 U.S. at 235.

---

[20] Because the District is treated as a federal entity and not a state for the purpose of analyzing
constitutional due process claims, such suits against the District "must be brought under the Fifth
and not the Fourteenth Amendment." *See Fisher v. Fulwood*, 774 F. Supp. 2d 54, 55 n.1 (D.D.C.
2011).

*Passman* involved an inquiry into "what 'important governmental objectives,' if any, are served by the gender-based employment of congressional staff." *Id.* at 236 n.9. In that context, *Passman* held:

> [W]e presume that justiciable constitutional rights are to be enforced through the courts. And, unless such rights are to become merely precatory, the class of those litigants who allege that their own constitutional rights have been violated, and who at the same time have no effective means other than the judiciary to enforce these rights, must be able to invoke the existing jurisdiction of the courts for the protection of their justiciable constitutional rights.

*Id.* at 242. The District of Columbia was not Ms. Konah's employer, which means that she cannot sue the District for gender discrimination under the DCHRA or Title VII. *E.g.*, 42 U.S.C. § 2000e-2 (prohibiting "unlawful employment practice[s]" by an "employer"). With no other avenue to address her claim of a violation of equal protection, she has a cause of action under the Fifth Amendment pursuant to this Court's general federal-question jurisdiction. *See Passman*, 442 U.S. at 243–44.

The Court thus turns to the second step of the *Monell* analysis to determine whether Ms. Konah has "stated a claim that a policy or custom of the District of Columbia caused the constitutional violation alleged." *Baker*, 326 F.3d at 1306. A plaintiff can make this showing in several ways; what it is important is that she allege an "affirmative link such that a municipal policy was the moving force behind the constitutional violation." *Id.* (internal quotation marks and citations omitted); *see also City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989). For example, a plaintiff can show a "custom or policy" by demonstrating "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Baker*, 326 F.3d at 1306–07 (citing *Harris*, 489 U.S. at 390 & *Daskalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000)).

According to the Complaint, the alleged hostile work environment and discriminatory acts were provoked by inmates and allowed without effective limitation by District employees or agents despite it being obvious that something needed to be done.  Compl. ¶¶ 18, 26, 30, 31; *see id.* ¶ 26 ("Plaintiff's supervisors and other management staff at the Central Detention Facility were aware that abusive actions by inmates toward Plaintiff are a pattern and practice . . . . ").  Ms. Konah's complaint is that the District did not sufficiently train its employees in the Department of Corrections to ensure that Unity nurses were not subjected to constant gender-based lewd and nasty catcalls or acts by the inmates.  Importantly, she has alleged sufficient facts to state a claim that District officials knew of the problem and that their failure to address it was deliberately indifferent.  *Id.* ¶ 26 ("Plaintiff, along with more than 10 nurses filed complaints of abuse by inmates and sexual harassment with the Warden . . . ."); *id.* ¶ 36 ("The same supervisors witnessed abusive and assaultive behaviors by inmates toward Plaintiff and other female staff.").

At this point, the District of Columbia seeks judgment on the pleadings.  The Court cannot oblige.  Whether Ms. Konah can prove a violation of her constitutional right to equal protection is not the current question.  The District's motion attacks only the sufficiency of the allegations in the Third Amended Complaint, which the Court finds are sufficiently clear and detailed to make out a cause of action.  *See Iqbal*, 556 U.S. at 679.[21]

---

[21] It bears emphasizing that denying the District's motion for judgment on the pleadings is not inconsistent with granting the summary judgment motions filed by Unity and Sgt. Jefferson.  The District's motion tests only the sufficiency of the pleadings, while the other motions require the Court to survey the record before it.  Moreover, as discussed above, DOC, not Unity, was responsible for security procedures at CDF.

The Court will thus grant the District's motion for judgment on the pleadings in all respects except in regards to Ms. Konah's claim of municipal liability for an equal protection violation.

## IV.  CONCLUSION

For the reasons set forth above, Unity's motion for summary judgment and Sgt. Jefferson's motion for summary judgment will be granted.  The District's motion for judgment on the pleadings will be granted except in regards to Ms. Konah's claim of municipal liability for an equal protection violation.  A memorializing Order accompanies this Opinion.

DATE: January 3, 2013

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge
