UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |   |
|---|---|---|
| LENA T. KONAH, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 10-904 (RMC) |
| DISTRICT OF COLUMBIA, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**OPINION**

Lena T. Konah worked as a licensed practical nurse at the D.C. Jail until the events that underlie this lawsuit caused her to take a leave of absence and eventually decide not to return. On her last day of work, Ms. Konah was accosted by a group of semi-clothed inmates who made repeated lewd comments and one of whom grabbed her buttocks. Totally unnerved by the experience, Ms. Konah contends that the District of Columbia failed to train its correctional employees to respond adequately to inmates' sexual abuse of staff and thus violated her right to equal protection under the Fifth Amendment's Due Process Clause. The District moves for summary judgment. For the reasons stated below, the Court will grant the motion.

**I. FACTS**

This case has previously been addressed by the Court. The facts and procedural history are set forth in detail in *Konah v. District of Columbia* (*Konah I*), 815 F. Supp. 2d 61 (D.D.C. 2011) (granting in part and denying in part motion to dismiss; exercising supplemental jurisdiction over state-law claims) and in *Konah v. District of Columbia* (*Konah II*), 915 F. Supp. 2d 7 (D.D.C. 2013) (granting summary judgment to Unity and Sgt. Robert Jefferson; granting partial judgment on the pleadings to the District). There is now only one count remaining: a

1

claim against the District of Columbia under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 691–92 (1978), alleging sexual harassment by inmates due to inadequate training of correctional officers. *See* 3d Am. Compl. [Dkt. 64] ¶¶ 54–62. This Opinion reviews only the facts relevant to the outstanding claim and states them in the light most favorable to Ms. Konah. No additional discovery was conducted after *Konah II* was issued, and that opinion was based on an extensive record, which included depositions of many key witnesses, documentary evidence, and video recordings. Therefore, the Court cites to the facts as set forth in *Konah II* except where additions are necessary or where the parties contend that a material factual dispute remains.

### A. Background

From November 2006 through September 2009, Ms. Konah worked as a Licensed Practical Nurse (LPN) for Unity Health Care, Inc., which provides medical services to inmates at the D.C. Central Detention Facility (CDF, also referred to as the D.C. Jail) under contract with the District's Department of Corrections (DOC). *Konah II*, 915 F. Supp. 2d at 12. One of the duties of LPNs was to distribute medicine to inmates, which nurses typically did in the housing units of the jail. *Id.* at 13. Correctional officers were required to accompany nurses at all times when they dispensed medication, and if an officer was not immediately available, a nurse could "just come back and wait for one." *Id.* (quoting Konah Dep. at 100; other record citations omitted). Waiting for an officer was Ms. Konah's typical practice. *Id.*

It was not uncommon for inmates to insult or assault staff at CDF by cursing them or using other inappropriate language, masturbating in front of them, or throwing urine, feces, or other liquids at them. *Id.* at 13, 25. The targets of these attacks were both correctional employees and contractors, including Unity nurses; both men and women were victims. *Id.*; *see also* Jefferson Dep., Def. Mot. Summ. J. (Def. MSJ) [Dkt. 90], Ex. 2 [Dkt. 90-4] at 42–45, 91–92

2

("Q. . . . [I]s the yelling, the cursing, the throwing of fecal matter, the throwing of urine, is that only limited to female officers? A. No."). As Dr. Benedict Kargbo, a CDF treatment specialist, testified:

> Q. Is the act of inmates throwing urine or feces at correctional staff, is that common?
> A. Yes. It happen[s] all the time.
> Q. And does it happen in other jails that you've worked in?
> A. Yes, it does.
> Q. And is it directed at females only?
> A. No.
> Q. Is it directed at nurses only?
> A. No.

Kargbo Dep., Def. MSJ, Ex. 5 [Dkt. 90-7] at 46–47, 62–63, 68–69. Sergeant Jefferson acknowledged, however, that inmates did not masturbate "frequently" in front of males, directing that behavior largely at female staffers. Jefferson Dep. at 42–44.

"Assault by Throwing Substances," including "liquids, blood, waste, chemicals, urine, etc." was listed as a Class I Major Offense in the Inmate Handbook given to all CDF inmates, and "[w]illfully subjecting an employee of the DOC to offensive bodily contact" was a Class II Serious Offense. *See* Inmate Handbook, Def. MSJ, Ex. 6 [Dkt. 90-8] at 16, 20. These violations were punishable with administrative penalties ranging from loss of privileges or work assignment to disciplinary detention; for a Class I Major Offense, disciplinary detention could be imposed for the remainder of an inmate's time in custody. *Id.* at 19–20, 23. Class I Major Offenses could also be prosecuted criminally. *Id.* at 16.

On April 21, 2009, several nurses, including Ms. Konah, sent a letter to Unity management, complaining about security practices at the jail. *Konah II*, 915 F. Supp. 2d at 13; *see also* April 21, 2009 Letter (4/21/09 Letter), Pl. Opp. Mot. Summ. J. (Pl. Opp.) [Dkt. 91], Ex. 5 [Dkt. 91-6] at 1. Titled "Deplorable Security Conditions During Medication Administration," the letter stated, in relevant part:

3

> We are writing this notice because of the deplorable security conditions we are facing during medication pass. On 4/11/09 feces were thrown on nurse Igwulu Francisca. On 4/19/09 some unknown liquid was thrown on nurse Tyler Ashly. Before then, about a week ago, unknown liquid was thrown on nurse Akoto Joyce. A similar incident happened to nurse Harper and nurse Nwaobilor. Nurse Tangunyi was hit with a bar of soap from behind. Unknown liquid was thrown on nurse Tandong.
>
> Curiously notwithstanding all this incidents and all our pleas for the situation to be looked into, nothing has been done. . . . We keep wondering if a nurse needs to be stabbed or even killed here before this issue will be looked into.
>
> We had previously brought our predicaments to the nursing administrator who promised to get in touch with the DOC administration so that the officers will bring the inmates to the bubble or to the sick call room to be medicated, but till this date we have not hear of the out come. . . .

4/21/09 Letter at 1 (alteration in brackets; all other spelling and formatting as in original). Nurses Tangunyi is male; Nurses Francisca Igwulu and Ashly (or Ashley) Tyler are females; Ms. Konah is female, and the rest of the nurses' genders are not in the record. Konah Dep., Def. MSJ, Ex. 1 [Dkt. 90-3] at 70–72.

"The bubble" referenced in the 4/21/09 Letter is the glass-walled control module staffed by corrections employees that sits at the entrance of each "open population" housing unit in the D.C. Jail. Open-population inmates are often released from their cells to mingle and congregate generally in their cell block. From the bubble, a corrections sergeant controls two gates for each cell block: one gate connects the cell block to a narrow hallway called the "sally port"[1] while the second gate connects the sally port to the main hallway of the jail. The sally port is the ingress and egress to the cell block for inmates and corrections staff, and inmates are not supposed to be in the sally port without a corrections officer as an escort. Only one gate in

---

[1] A modern sally port is most often a controlled entrance into a secured and protected area, such as a prison.

the sally port may be open at any given time because otherwise, inmates could run out into the hallway of the jail, which would be a security breach. Also referenced in the 4/21/09 Letter are "sick call rooms," which are small rooms with Dutch doors adjacent to the sally ports. A nurse can stand inside a sick-call room with the bottom half of the door closed and locked and dispense medication through the open top half of the door. To access a sick-call room, a nurse would sign out the key and return it when s/he was done. *Konah II*, 915 F. Supp. 2d at 12–13 (record citations omitted).

The parties dispute the evolution of the policy on the use of sick-call rooms. It is clear that prior to the 4/21/09 Letter, sick-call rooms were available for use, but the nurses' prevailing practice was to enter the cell blocks and dispense medication to inmates in open population or cell-to-cell. *See Konah II*, 915 F. Supp. 2d at 13. For example, CDF records show that Ms. Konah signed out a key and used a sick-call room in March 2009, *id.* (citations omitted), but she asserts that "the only policy on dispensing medications that she knew and understood . . . [was] that nurses dispensed medications on the units walking around the tiers/units and that there was no specific place to dispense medications," Pl. Statement of Material Facts in Dispute (Pl. SOF), Dkt. 91-1, ¶ 2.

After receiving the 4/21/09 Letter, Vali Zabiheian, Unity's Health Services Administrator and the senior management representative for Unity at the D.C. Jail, implemented a "sick call room policy" for medication distribution. *Konah II*, 915 F. Supp. 2d at 13. Under the new policy, "medication administration and dispensing by the nursing and pharmacy staff" was to "take place in the sick call rooms on the housing units," and Unity staff would "no longer walk on the housing units to administer medicine in open population." *Id.* (citing Apr. 22, 2009 Zabiheian Memo at 1). Despite the protection of a sick-call room, a corrections officer was

5

required to escort each nurse at all times. *Id.* This sick-call room policy was posted at CDF where Unity employees clock in, in the nursing station, and in the medication room, and a copy was sent to Warden Simon Wainwright. *Id.* In addition, at an April 30, 2009 meeting, all nursing staff, including Ms. Konah, were instructed to use the sick-call rooms when dispensing medicine. *Id.* at 13–14. Ms. Konah signed the attendance sheet for the April 30, 2009 training, and the meeting record reflects her attendance. *Id.* at 14 (record citations omitted). Ms. Konah further admitted that the signature is hers, but she equivocated during her deposition about whether she was at the meeting.[2] *Id.* (record citations omitted). Ms. Konah's counsel argues that even after the sick-call room policy was instituted, Ms. Konah continued to pass medications in the company of an officer in the housing unit because she did not understand that the policy had changed. *E.g.*, Pl. SOF ¶ 4.

### B. August 5, 2009 Incident

Ms. Konah's *Monell* claim derives from an incident that occurred on August 5, 2009, in which a crowd of semi-clad inmates in the sally port surrounded her and grabbed her buttocks.[3] While the summary judgment record contains some disputes about details of the

---

[2] As the Court noted in *Konah II*, Ms. Konah's deposition testimony contained numerous instances in which she claimed she could not remember or explain significant events or concepts, both relevant and irrelevant to the case. *See Konah II*, 915 F. Supp. 2d at 16 n.7. Ms. Konah relies on the exact same deposition testimony in opposing the District's motion for summary judgment. The Court again finds that Ms. Konah's nonresponsive answers are insufficient to create legitimate disputes of material fact. *Id.* at 16 (citing, *inter alia*, *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 195 (D.D.C. 2008)).

[3] Ms. Konah alleges that she filed other "complaints of sex harassment by inmates with her supervisors" that "receiv[ed] no action or response." Pl. SUF ¶¶ 10, 12. She cites pages 46 and 69–70 of her deposition as support, but the testimony at those pages states only that Ms. Konah agreed that the "incidents in [the 4/21/09 Letter] happened to [her]." Importantly, the 4/21/09 Letter did not allege sexual harassment. Asked whether she had ever made other reports to a supervisor about sexual harassment, Ms. Konah's inconsistent testimony concluded with her statement that she "can't recall" doing so. Konah Dep. at 70. Ms. Konah has offered no other evidence of such reports before her complaint to the D.C. Office of Human Rights. *See* DCOHR

6

incident, *see Konah II*, 915 F. Supp. 2d at 19–20, the Court views the essential facts in the light most favorable to Ms. Konah as summarized in *Konah II*:

> Ms. Konah was assigned to dispense medication to inmates on August 5, 2009, in a CDF housing unit known as Southwest–1 or SW 1. [Sergeant Robert] Jefferson was on duty at the Southwest–1 bubble that day. Ms. Konah varied from her usual practice of waiting for an officer and entered the sally port unescorted. She began to dispense medications to inmates in the sally port, close to the front gate. While she was there, the bubble gate opened and closed a few times, presumably to admit and discharge inmates obtaining medications. However, a group of inmates from the housing unit, dressed only in their undergarments, approached Ms. Konah in the sally port, making especially lewd and sexually threatening comments. She went to the bubble and asked Sgt. Jefferson to open the front gate to the corridor outside the unit so she could get away from the inmates, but he refused to respond or to open the gate, leaving her trapped in the sally port. As Ms. Konah returned to the front gate, the semi-clothed inmates surrounded her, calling her names and using sexually explicit language; one inmate grabbed her on the buttocks. Ms. Konah asked him something to the effect of "why did you touch me?" and screamed for help from Sgt. Jefferson. Dr. Benedict Kargbo, a treatment specialist at the Jail, entered the sally port from the housing unit, saw what was happening, and told the inmate to back away from Ms. Konah, which he did immediately. Dr. Kargbo joined Ms. Konah's demands that the front gate be opened. Sgt. Jefferson eventually opened the front gate. With a corrections officer at the entrance, Ms. Konah and Dr. Kargbo left the sally port at the front gate and entered the main hallway of the Jail.
>
> Ms. Konah was immediately taken to the infirmary. She also met with Unity and CDF management, including the Warden. She declined to press criminal charges against the inmate, who had been placed on lockdown and charged with several Class II Serious Offenses.

*Id.* at 14–15 (record citations omitted).

---

Compl., Pl. Opp., Ex. 11 [Dkt. 91-12] at 1 (complaining that she had been "subjected to derogatory comments and other sexually harassing acts by inmates").

### C. Ms. Konah's Other Evidence Regarding CDF

Ms. Konah has submitted collateral materials that, she argues, support her *Monell* claim. The Court finds that these materials deserve no significant weight because they are of dubious relevance at best. Ms. Konah has submitted the District of Columbia Inspector General's 2009 "Report of Re-inspection of the Central Detention Facility," Pl. Opp., Ex. 8, Dkt. 91-9 (OIG Report); a March 2009 report from the Commission on Accreditation for Corrections, *id.*, Ex. 9, Dkt. 91-10; and testimony from the Director of the D.C. Prisoners' Project before the D.C. Council, *id.*, Ex. 15, Dkt. 91-16. Ms. Konah asserts that these documents show "DOC officials and policy maker [sic] were aware that correctional officers at the CDF were not adequately trained in sexual abuse or security, and that it was a practice and custom at the CDF for the correctional officers not to follow DOC Post Orders, and that the failure to adequately train the correctional officers would lead to harm and violations of constitutional rights." Pl. SOF ¶ 27. The cited documents, however, almost exclusively discuss inmate conditions and not sexual abuse or security.[4] *E.g.*, OIG Report at 4 (finding that "DOC had addressed key findings and recommendations from a previous inspection," listing as examples "decreasing vermin contamination throughout the CDF" and "delivering proper dietetic meals to inmates"). Ms. Konah also embellishes the OIG Report's reference to inconsistent following of post orders, which in reality bore no relation to inmate assaults on staff, much less sex-based harassment or attacks. *Id.* at 18.

---

[4] Ms. Konah's opposition brief is disconcertingly rife with similar material misrepresentations of fact. For example, citing pages "42–34 [sic]" of Sergeant Jefferson's deposition, she asserts: "[Sergeant Jefferson] further stated that he did not take sexual harassment seriously and if a staff brought it to his attention he would not report it." Pl. Opp. at 12. Absolutely nothing in Sergeant Jefferson's deposition—on page 42, nearby pages, or otherwise—supports that assertion.

The Court does not rely on other materials submitted by Ms. Konah because tenuous relevance is the least severe of their infirmities. For example, she has offered two newspaper articles from the Washington City Paper describing assaults on inmates by other inmates, which are inadmissible hearsay. *See* Pl. Opp., Ex. 13 [Dkt. 91-14] & Ex. 14 [Dkt. 91-15]. She has also included a conclusory report from a "Correctional Consultant" (whose credentials are unrevealed and who has not been accepted as an expert by the Court) that asserts that the District "acted in a manner that was inconsistent with and below the applicable standard of care and accepted practices and procedures" on August 5, 2009, *id.*, Ex. 17, Dkt. 91-18. "[U]nsworn, unauthenticated documents cannot be considered on a motion for summary judgment," *Akers v. Liberty Mutual Group*, 744 F. Supp. 2d 92, 97 (D.D.C. 2010) (quoting *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993)), and "'sheer hearsay . . . counts for nothing' on summary judgment." *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (quoting *Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000)). Were these materials admissible on summary judgment, they would nonetheless remain irrelevant because they do not bear on Ms. Konah's *Monell* claim of a practice or custom of DOC that violated Ms. Konah's equal protection rights.

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

### III. ANALYSIS

In *Konah II,* this Court denied the District's motion for judgment on the pleadings on Ms. Konah's *Monell* claim because she had "alleged sufficient facts to state a claim that District officials knew of the problem"—"that the District did not sufficiently train its employees in the Department of Corrections to ensure that Unity nurses were not subjected to constant gender-based lewd and nasty catcalls or acts by the inmates"—"and that their failure to address it was deliberately indifferent." *Konah II*, 915 F. Supp. 2d at 31–32. But allegations are not evidence. The record on summary judgment shows no genuine disputes of material fact, and the District is entitled to judgment as a matter of law. Accordingly, the motion for summary judgment will be granted.

Constitutional claims against municipalities under 42 U.S.C. § 1983 are subject to a two-step analysis. *See Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)). First, a court must find that

the plaintiff suffered "a predicate constitutional violation." *Id.* (citation omitted). At the second step, a court must determine whether "a custom or policy of the municipality caused the violation." *Id.* (citing *Collins*, 503 U.S. at 120; other citations omitted); *see also Monell*, 436 U.S. at 694 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").

The predicate constitutional violation that Ms. Konah allegedly suffered is sexual harassment, which can constitute discrimination based on gender in violation of the equal protection component of the Fifth Amendment's Due Process clause.[5] *See* Pl. Opp. at 11. As the Court stated in *Konah II*:

> "[T]he Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws." *Davis v. Passman*, 442 U.S. 228, 234 (1979) (citations omitted). "To withstand scrutiny under the equal protection component of the Fifth Amendment's Due Process Clause," gender classifications must meet so-called "intermediate scrutiny," meaning that they "must serve important governmental objectives and must be substantially related to achievement of those objectives." *Id.* at 235; *see also United States v. Virginia*, 518 U.S. 515, 533 (1996) (applying same test to Fourteenth Amendment equal protection claim of gender discrimination). "The equal protection component of the Due Process Clause thus confers . . . a federal constitutional right to be free from gender discrimination which cannot meet these requirements." *Passman*, 442 U.S. at 235.

915 F. Supp. 2d at 30–31. A sexual harassment claim brought under the equal protection clause is actionable under § 1983. *See, e.g.*, *Annis v. Cnty. of Westchester, N.Y.*, 36 F.3d 251, 254 (2d Cir. 1994) ("[H]arassment that transcends coarse, hostile and boorish behavior can rise to the

---

[5] Because the District is treated as a federal enclave and not a state for the purpose of analyzing constitutional due process claims, such suits against the District "must be brought under the Fifth and not the Fourteenth Amendment." *See Fisher v. Fulwood*, 774 F. Supp. 2d 54, 55 n.1 (D.D.C. 2011).

11

level of a constitutional tort."); *Pontarelli v. Stone*, 930 F.2d 104, 113–114 (1st Cir. 1991), *abrogated on other grounds by Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993).

The record is clear that all staff at the D.C. Jail—whether employed by the District of Columbia or Unity and whether male or female—were subject to some amount of verbal abuse and noxious substances from inmates. It is also clear that masturbation by inmates occurred most often in sight of female staff, although masturbation was not exhibited to Ms. Konah on August 5, 2009, or, perhaps, ever during her tenure at the D.C. Jail. *See* Konah Dep. at 68–73, 248–50 (referring to nonspecific incidents of "sexual remarks" that she "can't recall" but never mentioning exhibitionist self-gratification). Notably, the nursing staff employed by Unity at the D.C. Jail in April 2009 was largely, although not exclusively, women, but they attributed inmate misconduct to a lack of security, not sexual harassment directed against their gender. Nonetheless, there is also no dispute that inmates directed lewd, sexually explicit comments specifically at Ms. Konah and that one inmate grabbed her on the buttocks on August 5, 2009.

The Court is left with the complexity—through record evidence now or at a later trial—of attempting to cull inmate misconduct directed to both sexes from that directed to women due to the recipient's gender. This complicated and time-consuming task could ultimately be for naught because it is unclear that § 1983 would cover a claim of sexual harassment when the offense arises from lewd *inmate* conduct.[6] The Court avoids this quagmire

---

[6] In the context of an alleged hostile work environment in a jail, under Title VII, 42 U.S.C. § 2000e *et seq.*, courts have ruled that an "employer may be liable if he 'fails to take immediate and appropriate corrective action in response to a hostile work environment of which the employer knew or reasonably should have known.'" *Konah II*, 915 F. Supp. 2d at 24 (quoting *Beckford v. Department of Corrections*, 605 F.3d 951, 957–58 (11th Cir. 2010)). But "[c]ourts

12

by moving instead to the second part of the *Monell* test, which proves to be dispositive even if Ms. Konah had proved an equal protection violation.

Because a municipality is liable only "where the municipality itself causes the constitutional violation at issue," *Simms v. District of Columbia*, 587 F. Supp. 2d 269, 276 (D.D.C. 2008) (citing *Monell*, 436 U.S. at 694), there must be "an affirmative link . . . such that a municipal policy was the moving force behind the constitutional violation," *Baker*, 326 F.3d at 1306 (internal quotation marks and citations omitted). While a plaintiff may bring suit based on an actual, identifiable policy or practice, an actionable policy may also exist when a municipality fails "to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Baker*, 326 F.3d at 1306 (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). The Supreme Court has cautioned that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).

A municipality is deliberately indifferent when it has knowledge that its agents are likely to violate constitutional rights, and the municipality "adopt[s] a policy of inaction." *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004). A court must determine "whether the municipality knew or should have known of the risk of constitutional violations, an objective standard." *Baker*, 326 F.3d at 1307 (citing *Farmer v. Brennan*, 511 U.S. 825, 841 (1994)). A municipality is not deliberately indifferent simply because it fails to "take reasonable care to discover and prevent constitutional violations." *Warren*, 353 F.3d at 39. For liability to

---

have repeatedly declined to impose sexual harassment liability upon correctional institutions for the sexually offensive conduct of inmates, as long as the defendant institution took proper preventive and remedial steps with regard to inmate behavior." *Powell v. Morris*, 37 F. Supp. 2d 1011, 1017 (S.D. Ohio 1999).

attach, "the identified deficiency in the city's training program must be closely related to the ultimate injury." *Harris*, 489 U.S. at 391.

Ms. Konah cannot meet the "stringent standard of fault" for the alleged failure-to-train for three reasons. *See Thompson*, 131 S. Ct. at 1360 (quoting *Board of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). First, setting aside her apparent violation of the new sick-call room policy, the precipitating cause of the August 5, 2009 incident was Ms. Konah's own decision to violate longstanding policy and deviate from her standard practice of waiting for a corrections officer to escort her before entering the housing unit. *See* Konah Dep. at 100 ("Q. And do you typically wait for an officer if one is not available? A. Yes."). This alone is sufficient to grant summary judgment for the District because a *Monell* plaintiff must show that "the identified deficiency in the city's training program" was "closely related to the ultimate injury." *Harris*, 489 U.S. at 391. Ms. Konah seeks to expand this lawsuit into a referendum on whether DOC officials "take sexual harassment or sexual abuse seriously," Pl. Opp. at 12, or whether DOC employees had "received sexual harassment or sexual abuse training," *id.* at 10, but the alleged harm was caused by Ms. Konah's admitted choice to enter the sally port without waiting for the security of a corrections officer. There is no suggestion that Ms. Konah was forced to enter the housing unit without an escort or that she could not have waited for an officer to accompany her, as she herself conceded at her deposition.[7] *See* Konah Dep. at 103–04. To the extent that Ms. Konah complains that Sergeant Jefferson should have opened the gate to allow her to escape the inmates in the sally port, as the Court concluded in *Konah II*, "[e]ven

---

[7] The Third Amended Complaint alleges that Ms. Konah "was assigned by her supervisor to dispense medications to inmates . . . without security escort," 3d Am. Compl. ¶ 14, but at the close of discovery, Ms. Konah pointed to no evidence to support that assertion. Mere unsubstantiated allegations are insufficient to survive summary judgment. *See Greene*, 164 F.3d at 675.

14

[Ms. Konah's] deposition, viewed in the light most favorable to her and setting aside the many inconsistencies and memory gaps, does not tend to show that Sgt. Jefferson 'just did not open the gate' for any reason other than that there were inmates in the sally port who would have been able to escape confinement." 915 F. Supp. 2d at 23. It is worth noting that Ms. Konah conceded at deposition that her claims are based on her belief that Sergeant Jefferson "did not open the gate to let me out as I asked him before the inmate came and touched me." Konah Dep. at 227–28. There is no evidence tending to show that any municipal policy was the "moving force" behind the August 5, 2009, incident, rather than Ms. Konah's own decision to enter the unit without a corrections officer escort, mandated by DOC policy and as per her typical practice.

The second fatal shortcoming in Ms. Konah's *Monell* claim is the disconnect between the sexual harassment she suffered on August 5, 2009, and the evidence she has offered to show that the District was deliberately indifferent to a need for better corrections officer training. Again, despite counsel's attempt to transform this case into a sweeping review of management of the D.C. Jail, the circumstantial evidence relied on by Ms. Konah does not show "deliberate indifference to the risk that not addressing the need will result in constitutional violations." *See Baker*, 326 F.3d at 1306. Ms. Konah's proffered evidence of deliberate indifference supports two conclusions: first, in 2009, CDF had a general problem of inmates cursing and throwing fecal matter or urine at staff, including nurses; and, second, in the late 2000s, the District was actively trying to remedy inmate conditions and overall management at CDF. But none of this evidence shows that the District was deliberately indifferent to any problem of *sexual harassment of staff by inmates*, which is the alleged constitutional violation at issue. The 4/21/09 Letter, relied on by Ms. Konah, stated nurses' concerns about security and thrown bodily waste, not sexual harassment, and even the most relevant part of the OIG

15

Report—the section regarding correctional officer compliance with post orders—did not mention staff security, much less sexual harassment of contractors. To the contrary, it primarily addressed issues regarding "a safe, clean, secure, and human environment for inmates." OIG Report at 18. Generalized concerns about a need for increased safety at CDF are not sufficient to prove deliberate indifference to sexual harassment of the kind experienced by Ms. Konah. Thus, there is no evidence that the District "adopt[ed] a policy of inaction" that led to a violation of constitutional rights. *Warren*, 353 F.3d at 39.

Third, even assuming that the ongoing, general concerns about conditions at CDF somehow should have put the District on notice of the risk of nurses experiencing sexual harassment, the record reflects that Unity and the District collaborated to address those concerns. The day after receiving the 4/21/09 Letter, Unity determined that all nurses would be required to distribute medication from within the sick-call rooms. This policy was distributed to Unity and CDF staff and was the subject of the April 30, 2009 Unity staff meeting. Ms. Konah argues that "she did not understand that the policy had changed," Pl. SOF ¶ 4, but her subjective lack of understanding is not evidence that the District "knew or should have known of the risk of constitutional violations." *Baker*, 326 F.3d at 1307; *see also Konah II*, 915 F. Supp. 2d at 26 (observing that Unity was bound by DOC security policies and concluding that "Unity took reasonable and appropriate corrective steps to ensure that the environment for Unity nurses at CDF would be as safe and non-hostile as a job situation in a jail requiring direct contact with inmates could be"). Moreover, as the Court discussed in *Konah II*, "[t]he follow-up by Unity and DOC to the August 5, 2009 incident was also comprehensive, including the immediate medical evaluation of Ms. Konah by the infirmary, a meeting with the warden, the offer of criminal prosecution, and the use of the internal CDF disciplinary system to which inmates are

16

subject." 915 F. Supp. 2d at 26. These responses are far more robust than the failure to respond that the Ninth Circuit found supported a correctional facility's Title VII hostile work environment liability for failure to respond to inmate sexual misconduct in *Freitag v. Ayers*, 468 F.3d 528, 540–41 (9th Cir. 2006), cited by Ms. Konah. In *Freitag*, for example, there were specific complaints "by female officers about exhibitionist masturbation," and the jail had neither used its own disciplinary process sufficiently nor adopted any of the other corrective measures available. *Id.* The responses to the 4/21/09 Letter and to the August 5, 2009 incident do not reflect deliberate indifference.

There is no doubt that the August 5, 2009 incident justifiably unnerved Ms. Konah. However, persons who work in close contact with inmates face dangerous and difficult circumstances each day, even in the best-managed facilities. Were Ms. Konah able to prove that inmate sexual harassment violated her rights to equal protection of the laws, there is no evidence that the District failed to train correctional officers in a way that would have averted the incident, and there is evidence that Ms. Konah could have avoided it by following known policy. On these facts, Ms. Konah has not shown that the any custom or policy is to blame for her alleged constitutional injury.

### IV. CONCLUSION

For the foregoing reasons, the District of Columbia's Motion for Summary Judgment, Dkt. 90, will be granted. A memorializing Order accompanies this Opinion.


Date: September 20, 2013

/s/
ROSEMARY M. COLLYER
United States District Judge